UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GARY DUTTON, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | Case No. 4:04CV147SNL |
| D&K HEALTHCARE RESOURCES, ET. AL., ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM

Lead Plaintiff has filed this second amended complaint on behalf of purchasers of D&K Healthcare Resources, Inc.'s (hereinafter referred to simply as D&K) common stock between August 10, 2000 and September 16, 2002, inclusive. He asserts violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (Count I - all defendants[1] and Section 20(a) of the Securities Exchange Ac of 1934 (Count II - Individual Defendants only). This matter is before the Court on BMS's motion to dismiss (#87), filed January 28, 2005. Extensive responsive pleadings have been filed and this matter is now ripe for disposition.

Defendant BMS seeks to dismiss this second amended complaint for expiration of the applicable statute of limitations; for failure to state an actionable Section 10(b) primary violation claim; and/or for failure to state a claim under Rule 12(b)(6) Fed.R.Civ.P. in connection with the fraud pleading requirements of Rule 9(b) Fed.R.Civ.P. and/or the "heightened pleading

---

[1]The defendants in this case are as follows: D&K Healthcare Resources, Inc.; Bristol-Myers Squibb (hereinafter referred to as BMS); and J. Hord Armstrong, III, Martin D. Wilson, Thomas S. Hilton, and Richard Plotnick (hereinafter referred to as the Individual Defendants).

requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §78u-4.

The claims contained in the second amended complaint essentially boil down to an allegation that the defendants all conspired to engage in a "scheme to defraud" or course of conduct designed to operate as a fraud or deceit upon D&K investors between August 10, 2000 and September 16, 2002. Lead Plaintiff alleges that the defendants participated in "channel-stuffing" transactions which were misreported in D&K's financial statements and in media reports.

Specifically, the second amended complaint alleges that, in order to take advantage of incentives offered by BMS, D&K "would purchase extremely large quantities of drugs from suppliers such as Bristol-Myers" during the alleged class period "and hold it until the price increased." Second Amended Complaint, ¶38. The second amended complaint further alleges that BMS accounted for approximately 50% of the Westin division's sales during the class period. Second Amended Complaint, ¶42. The second amended complaint further alleges that all inventory purchased "in excess of [D&K]'s ordinary course of business inventory level" was "nothing more than a consignment - and not a sale" pursuant to SAB 101, and was improperly reported as assets in D&K's financial statements. Second Amended Complaint, ¶48. By including this excess inventory as "assets" on its balance sheet, "D&K improperly inflated its own financial statements - in violation of GAAP - and misled investors as to the true basis for [D&K]'s increasing inventory sales and earnings". Second Amended Complaint, ¶51.

The second amended complaint alleges that, in an April 25, 2002 press release, BMS announced BMS' financial results for the first quarter of 2002 and stated that its U.S. pharmaceutical sales had decreased 20% in that quarter. Second Amended Complaint, ¶74.

Moreover, Lead Plaintiff alleges that in the same April 25th press release, BMS attributed a portion of the decline to the overstocking of BMS' wholesalers with inventory. Second Amended Complaint, ¶74. Lead Plaintiff further alleges that on July 11, 2002, BMS disclosed that the SEC had been investigating BMS' accounting for these large purchases since April 2002. Second Amended Complaint, ¶75. The second amended complaint further alleges that BMS was "forced to stop the practice of channel stuffing on or about April 2002". Second Amended Complaint, ¶13

According to the Lead Plaintiff, the "revelation of the fraud [came] in September 2002" when on September 16, 2002, D&K announced to the market that it would miss earnings projections by a large margin. Second Amended Complaint, ¶¶16, 77. The next day, allegedly as a result of this announcement, D&K's stock price fell more than 60%. Second Amended Complaint, ¶77. A week later, on September 24, 2002, "D&K finally disclosed that it had been receiving `special purchasing opportunities' but that they no longer existed for the Company." Second Amended Complaint, ¶81.

Lead Plaintiff further alleges that on March 18, 2003, BMS filed its 2001 Form 10-K/A in which it restated its financial results for 1999, 2000, 2001, and the first two quarters of 2002 including its revenue from shipments made to certain wholesalers. Second Amended Complaint, ¶84. Lead Plaintiff alleges that, in this restatement, BMS "admitted to improperly recording a large portion of its shipments to wholesalers as `sales rather than consignments'". Second Amended Complaint, ¶84. Lead Plaintiff further alleges that "these consignments were the result of incentives that they offered to wholesalers `towards the end of a quarter in order to incentivize[2]

---

[2]Although the Court appreciates creativity in pleadings, it must draw the line at words such as "incentivize" that have failed to make it into any recognized English language dictionary.

3

wholesalers to purchase products in an amount sufficient to meet the Company's quarterly sales projections". Second Amended Complaint, ¶84.

Nowhere in the second amended complaint does the Lead Plaintiff assert that BMS actually participated in the preparation or dissemination of the allegedly fraudulent D&K financial statements and press releases/media reports upon which market analysts and/or investors relied. Nowhere in the second amended complaint does the Lead Plaintiff assert that BMS made any statement, misleading or otherwise, relating to D&K's financial reports, or that BMS had any duty to disclose any information regarding its business transactions with D&K's shareholders.

In its motion to dismiss, BMS contends that the Lead Plaintiff 1) has failed to bring this action within the applicable two (2) year statute of limitations; 2) has, at best, pleaded an "aiding and abetting" claim which is not actionable as a violation of Section 10(b) and Rule 10b-5; and 3) has failed to state any claim against it for violations of Section 10(b) and Rule 10b-5.

In passing on a motion to dismiss, a court must view the facts alleged in the complaint in the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232 (1974); Conley v. Gibson, 355 U.S. 41, 45-46(1957); Toombs v. Bell, 798 F.2d 297, 298 (8th Cir. 1986). The court must accept the allegations in the complaint as true and draw reasonable inferences in favor of the nonmoving party, dismissing the complaint only if "it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, *supra*, 355 U.S. at 45-46; *see also*, Moses.com Securities v. Comprehensive Software Systems, Inc., 406 F.3d. 1052, 1062 (8th Cir. 2005). "Although the pleading standard is liberal, the plaintiff must allege facts -- not mere legal conclusions -- that, if true, would support the existence of the claimed torts. Moses.com, at 1062 *citing* Schaller Tel.Co. v. Golden Sky Sys., 298 F.3d. 736, 740 (8th Cir. 2002). In viewing the complaint in the light most favorable to

the plaintiff, the court should not dismiss it merely because the court doubts that the plaintiff will be able to prove all of the necessary allegations. Bennett v. Berg, 685 F.2d. 1053, 1058 (8th Cir. 1982). Thus, a motion to dismiss is likely to be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982).

### **Sarbanes-Oxley Act of 2002 - Statute of Limitations in Securities Fraud Cases**

In 2002, Congress passed the Sarbanes-Oxley Act of 2002, 28 U.S.C. §1658(b), which established as new statute of limitations for federal securities law claims. The new law applies a statute of limitations for private securities fraud cases to shorter of two (2) years from date of discovery or five (5) years from date of occurrence. The Sarbanes-Oxley Act provides, in pertinent part:

> "(b) . . . a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of –
>
> (1) 2 years after the discovery of the facts constituting the violation; or
> (2) 5 years after such violation."

28 U.S.C §1658(b)(1) and (2); In Re: ADC Telecommunications, Inc. Securities Litigation, 409 F.3d. 974, 976-77 (8th Cir. 2005).

Defendant BMS alleges that the Lead Plaintiff was well aware of the facts he claims constituted the securities law violations no later than September 2002 but failed to file an amended complaint first naming BMS as a defendant until November 2004, more than 26 months after discovering the conduct he now alleges was fraudulent.

A plaintiff in a federal securities lawsuit is deemed to have discovered fraud for purposes of triggering the applicable statute of limitations not only when said plaintiff actually discovers the alleged fraud but also when said plaintiff was on "inquiry notice" of such alleged fraud. Great Rivers Co-op of Southeastern Iowa v. Farmland Indus., Inc., 120 F.2d. 893, 896 (8th Cir. 1997)[3]; *see also*, Ritchey v. Horner, 244 F.3d. 635, 638-341 (8th Cir. 2001); Cohen, et. al. v. Northwestern Growth Corp. et. al., 385 F.Supp.2d. 935 (D.S.D. 2005). The determination of whether "inquiry notice' of federal securities fraud exists is an objective standard based upon facts known to the plaintiff; i.e. when the plaintiff is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the alleged fraudulent conduct. Ritchey, at 638; Great Rivers Cooperative of Southeastern Iowa, at 896; Cohen, at 945. Inquiry notice exists when there are "storm warnings" that would alert a reasonable person of the possibility of misleading information, disseminated either by an act or by omission. Great Rivers Cooperative of Southeastern Iowa, at 896 *citing* Davidson v. Wilson, 973 F.2d. 1391, 1402 (8th Cir. 1992); *see also*, Cohen, at 945 *citing* Great Rivers, *supra.* and Davidson, *supra.* Although the issue of whether a plaintiff was on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6), where the complaint contains facts needed to make a determination regarding whether a reasonable investor of ordinary intelligence would have been aware of the existence of the alleged fraud, a court may properly rule on the issue of inquiry notice on a motion to dismiss. Cohen, at 945 (internal citations omitted). Finally, since the statute

---

[3] The relevant caselaw on the issue of timeliness in securities fraud cases for the most part predate the enactment of the Sarbanes-Oxley Act on July 30, 2002. However, it appears to this Court that the Eighth Circuit has yet to change its mind set as to the principles embraced in these pre-2002 cases regarding inquiry notice; thus, until the Eighth Circuit or the United States Supreme Court determine that the doctrine of inquiry notice does not apply to the expanded statute of limitations under the Sarbanes-Oxley Act, the Court finds that the principles set forth in such cases are still applicable and provide guidance to this Court.

of limitations argument is an affirmative defense, the defendant bears the burden of proof. Ritchey, at 639; *see also*, Comcast of Illinois X, L.L.C. v. Multi-Vision Electronics, Inc., -F.Supp.2d. -, 2005 WL 2177070 (D.Neb. September 8, 2005).

In determining whether inquiry notice exists, the Court must ascertain 1) the facts of which the plaintiff was aware; 2) whether a reasonable person with knowledge of those same facts would have investigated the situation further; and 3) whether upon investigation, a reasonable person would have acquired actual notice of the defendant(s)' misrepresentations. Ritchey, at 639 *citing* Great Rivers Cooperative of Southeastern Iowa, at 896; Cohen, at 945 *citing* Great Rivers, *supra*.

Upon consideration, the Court finds that dismissal of the Lead Plaintiff's Section 10(b) and Rule 10b-5 claims is appropriate, as the statute of limitations expired no later than September 24, 2004. Based upon the allegations pled in the second amended complaint, Lead Plaintiff had inquiry notice, if not actual notice, of the alleged fraud as of September 2002.

Lead Plaintiff was aware of a "significant drop of over 65%" in D&K's stock price from October 1999 to May 2000. Second Amended Complaint, ¶34. He attributed this drop to D&K's loss of two (2) of its biggest customers and the sales related to these customers as noted in the company's 10-K for FY01. Lead Plaintiff avers that D&K implemented a strategy to compensate for the loss of this business by engaging in "speculative purchases" which it presented to the market and investors in its public statements as "opportunities to purchase branded pharmaceuticals from manufacturers at attractive prices." Second Amended Complaint, ¶35. Second Amended Complaint, ¶36. Lead Plaintiff further avers that as of 2001 the Westin facility averaged $150 million per month in sales; yet, on average each of D&K's other distribution facilities only had sales of approximately $250 per year. Second Amended Complaint, ¶39. Lead

Plaintiff further avers that between November 2000 and October 2003, BMS was the largest supplier of pharmaceuticals to the Weston facility, accounting for approximately 50% of the total inventory. Second Amended Complaint, ¶42. Lead Plaintiff further avers that in Spring 2002, BMS ceased making shipments of its pharmaceutical products to the Westin facility; however, throughout 2001 and 2002 D&K via numerous press releases and its prospectus announced a secondary offering of its stock and expansion of its credit facilities. Second Amended Complaint, ¶¶42, 69-73. Lead Plaintiff further avers that on April 25, 2002 BMS issued a press release announcing a decline in its revenue for the first quarter of 2002 which it partly attributed to the "overstocking of the company's wholesalers with inventory.". Second Amended Complaint, ¶74. Lead Plaintiff further avers that on July 11, 2002 BMS disclosed publicly the SEC investigation into its inventory and accounting practices. Second Amended Complaint, ¶75. Lead Plaintiff further avers that following a conference call with analysts on August 14, 2002, D&K, on September 16, 2002 "shocked the market when it announced that it was reducing its `EPS guidance before one-time charges related to the implementation of SFAS 142 to approximately $0.13-$0.17, from $0.30 to $0.31.'" Second Amended Complaint, ¶77. Lead Plaintiff further avers that in a press release the same day, defendant Armstrong outlined the sales shortfalls resulting in a reversal of the growth in revenue and later discussed same with analysts. Second Amended Complaint, ¶77. Lead Plaintiff further avers that "[i]n response to these disclosures, on September 17, 2002, the price of D&K common stock dropped more than 60% to close at $9.51 per share on extremely high trading volume." Second Amended Complaint, ¶79. Lead Plaintiff further avers that in an article published in the St. Louis Post-Dispatch on September 18, 2002 entitled **<u>Investors Pummel D&K for Surprise Forecast</u>**, A.G. Edwards analyst Andrew Speller stated "[Y]ou had the end of a growth story", and he changed his "buy" rating on D&K to a "sell"

as did analysts at four (4) other brokerage firms. Second Amended Complaint, ¶80. Lead Plaintiff further avers that also in this same article defendant Wilson had stated that "some manufacturers may be cutting back on deals in reaction to the Securities and Exchange Commission's inquiry into Bristol-Myers Squibb Co.'s accounting of its deal-based forward-selling practices" and that BMS had disclosed in April 2002 that "the sales incentives it used in previous years encouraged wholesalers to stockpile products." Second Amended Complaint, ¶80. The Lead Plaintiff further avers that, on September 24, 2002, in its Form 10-K for fiscal year 2002, "D&K finally disclosed that it had been receiving `special purchasing opportunities'" which it was no longer receiving. Second Amended Complaint, ¶81.

The Court finds that a reasonable investor of ordinary intelligence and through the exercise of reasonable diligence would have been able to ascertain the alleged fraud as of September 2002. Indeed, Lead Plaintiff, in its own pleading, affirmatively alleges that as of September 24, 2002 by virtue of D&K's 10-K filing, "these disclosures admitted to the market that the financial benefits achieved as a result of the fraudulent scheme had come to an end." Second Amended Complaint, ¶15. Whether it be actual notice or inquiry notice, Lead Plaintiff failed to exercise reasonable diligence and the Section 10(b) and Rule 10b-5 claims against BMS are time-barred.

### Federal Securities Law - Section 10(b) and Rule 10b-5

*Assuming arguendo* that the federal securities claims against defendant BMS are not time-barred, such claims still fail because they fail to state an actionable violation of Section 10(b) and Rule 10b-5.

In Count I of his second amended complaint, Lead Plaintiff alleges violations of Section

9

10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in the sale and purchase of securities. Section 10(b) forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations". Dura Pharmaceuticals v. Broudo, - U.S. -, 125 S.Ct. 1627, 1630-31 (2005) *citing* 15 U.S.C. §78j(b); *see,* Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P., 395 F.3d. 851, 853-54 (8th Cir. 2005); In re: K-Tel International, Inc. Securities Litigation, 300 F.3d. 881, 888 (8th Cir. 2002); In re: Navarre Corp. Securities Litigation, 299 F.3d. 735, 741 (8th Cir. 2002). Rule 10b-5 forbids, any person, directly or indirectly, from employing any device, scheme or artifice to defraud; in the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security. In Re: Charter Communications Securities Litigation, 443 F.3d. 987, 990 (8th Cir. 2006) *citing* 17 C.F.R. §240.10b-5; Dura Pharmaceuticals, 125 S.Ct. at 1631 *citing* 17 C.F.R. §240.10b-5 (2004).

In Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), the Supreme Court found that §10(b) prohibits only "manipulative or deceptive" devices or contrivances, and that private plaintiffs "may not bring a [Rule] 10b-5 suit against a defendant for acts not prohibited by the text of §10(b)." Central Bank, 511 U.S. at 173; Charter Communications, at 990. "In earlier cases, the Court held that `deceptive' conduct involves either the misstatement or a failure to disclose by one who has a duty to disclose. `Manipulative,' as used in the securities context, is a `term of art' and refers to illegal trading practices such as `wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially

10

affecting market activity.'" Charter Communications, at 990 (internal citations omitted). Based upon these earlier cases and the text and legislative history of the 1934 Act, the Court in Central Bank, *supra.*, held that Rule 10b-5 does not reach those persons who only aid or abet a violation of §10b. Central Bank, 511 U.S. at 177; Charter Communications, at 990. However, the law's reach is not completely cut off as to these persons:

> "The absence of §10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met."

Central Bank, 511 U.S. at 191; Charter Communications, at 991 *quoting* Central Bank, *supra.*

Upon review of Central Bank, *supra.*, the Eighth Circuit Court of Appeals concluded that it stood for three (3) governing principles: 1) the "categorical declaration" that a private plaintiff may not bring a Rule 10b-5 lawsuit against a defendant for acts not prohibited by the text of §10b included claims under Rule 10b-5(a) and (c), as well as Rule 10b-5(b); 2) a device or contrivance is not "deceptive" within the meaning of §10b, absent some misstatement or failure to disclose by one who has a duty to disclose; and 3) the term "manipulative" in §10b has a limited contextual meaning as defined in Santa Fe Industries, Inc.v. Green, 430 U.S. 462, 476-77 (1977) and adopted by the Court in Central Bank, *supra.* Charter Communications, at 992. "Thus, any

11

defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under §10(b) or any subpart of Rule 10b-5." Charter Communications, at 992 (internal citations omitted).

Upon careful review of the Lead Plaintiff's allegations as contained in his second amended complaint, the Court determines that he has failed to state an actionable violation of Section 10(b) and Rule 10b-5.

The second amended complaint alleges that D&K and BMS "engaged in a fraudulent `channel-stuffing' scheme and misrepresented the Company's financial results to the investing public." Second Amended Complaint, ¶2. It further states that "Bristol-Myers was an active, knowing and integral participant in the D&K defendants' fraud." Second Amended Complaint, ¶7. However, such statements are conclusionary and are not supported by the factual statements in the Second Amended Complaint which allegedly detail the fraud as it was perpetrated upon the plaintiff class. The market price for D&K stock was allegedly artificially inflated due to the "growth which D&K defendants misleadingly reported to the market and repeatedly forecasted for future quarters." Second Amended Complaint, ¶7. Furthermore, D&K stockholders are alleged to have relied upon, not any action; i.e. sales by BMS to D&K, but rather upon D&K's "improper accounting . . . false and misleading financial statements" in that "D&K's Class Period financial statements improperly failed to disclose that a material amount of its reported sales were derived from supplier inventory it held on a consignment basis . . . D&K materially mislead investors about its true business risks . . .". Second Amended Complaint, ¶103. Lead Plaintiff goes to great lengths to demonstrate the "falsehoods" of numerous other public statements made by D&K during the Class Period. Second Amended Complaint, ¶¶108-148. The Lead Plaintiff

clearly characterizes D&K as the alleged primary violator of Section 10(b) and Rule 10b-5 because "by filing financial statements with the SEC which did not comply with GAAP during the Class Period, defendants disseminated financial statements of D&K which were presumptively misleading and inaccurate." Second Amended Complaint, ¶105.

The allegations of the Second Amended Complaint only refer to material misrepresentations or omissions made by D&K in its financial statements and press releases/media reports upon which D&K shareholders relied when making an investment decision. There are no allegations that said shareholders relied upon any financial statements and press releases/media reports of BMS when making an investment decision regarding D&K. At best, all the Lead Plaintiff has stated is that BMS engaged in certain business transactions with D&K, which D&K allegedly misreported in its financial statements, thereby inflating D&K's reported assets and misleading D&K investors as to the true nature of its growing revenue. Whether or not these "business transactions" were a "scheme", a "conspiracy", or BMS was an "active participant" is immaterial because neither primary liability or secondary liability can be established unless the Lead Plaintiff can show that BMS made a materially false statement or omission upon which D&K investors relied upon in making investment decisions regarding D&K. This very same situation was addressed by the 8th Circuit in Charter Communications, *supra.* The scheme alleged consisted of Charter entering into firm contracts with certain Vendors to purchase set-top boxes at a set price; however, Charter then agreed to pay the Vendors an additional $20 per set-top box in exchange for the Vendors returning the additional payments to Charter in the form of advertising fees. Charter Communications, at 989.

> "Plaintiffs alleged that these were sham or wash transactions with no economic substance, contrived to inflate Charter's operating cash flow by some $17,000,000 in the fourth quarter of 2000 in order to meet the revenue and operating

13

> cash flow expectations of Wall Street analysts. Charter
> accomplished the deception with fraudulent accounting
> by improperly capitalizing the increased equipment expenses
> while treating the returned advertising fees as immediate
> revenue. **Plaintiffs alleged that the Vendors entered
> into these sham transactions knowing that Charter
> intended to account for them improperly and that
> analysts would rely on the inflated revenues and
> operating cash flow in making stock recommendations.
> Plaintiffs did not allege that the Vendors played any
> role in preparing or disseminating the fraudulent
> financial statements and press releases through which
> Charter published its deception to analysts and investors.**"

Charter Communications, at 989-90 (emphasis added). Relying on Central Bank, *supra.*, the district court had concluded that the plaintiffs' claims against the Vendors were claims for aiding and abetting and thus, not actionable §10(b) violations. Charter Communications, at 990-91. The district court based its conclusion on the fact that the plaintiffs did not assert that the Vendors had made any statement, omission, or action at issue or that they [plaintiffs] had relied on any statement, omission or action made by the Vendors. Id., at 991. Furthermore, the plaintiffs had not alleged the Vendors were responsible or were involved with the preparation of the allegedly misleading financial statements, the allegedly improper internal accounting practices, or the allegedly false and/or misleading public statements made by Charter. Id., at 991. Finally, the plaintiffs had not alleged that the Vendors had any duty to review the subject statements or any duty whatsoever to Charter's investors. Id., at 991.

The Eighth Circuit agreed with the district court's findings and holdings as to the Vendors. It reviewed Central Bank, *supra.*, and found that "any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and

cannot be held liable under §10(b) or any subpart of Rule 10b-5." Charter Communications, at 992. The Court then reviewed the case at hand and concluded:

> "In this case, the focus of plaintiffs' §10(b) and Rule 10b-5 claims was deception – they alleged a `continuous course of conduct' in which Charter allegedly `made and/or failed to correct public representations which were or had become materially false and misleading regarding Charter's financial results and operations . . . However, neither Motorola nor Scientific-Atlanta **[Vendors]** was alleged to have engaged in any such deceptive act. They did not issue any misstatement relied upon by the investing public, nor were they under a duty to Charter investors and analysts to disclose information useful in evaluating Charter's true financial condition. None of the alleged financial misrepresentations by Charter was made by or even with the approval of the Vendors. Accordingly, the district court properly dismissed the claims against the Vendors as nothing more than claims, barred by *Central Bank*, that the Vendors knowingly aided and abetted the Charter defendants in deceiving the investor plaintiffs.
>
> . . . we are aware of no case imposing §10(b) or Rule 10b-5 liability on a business that entered into an arm's length non-securities transaction with an entity that then used the transaction to publish false and misleading statements to its investors and analysts. The point is significant. To impose liability for securities fraud on one party to an arm's length business transaction in goods or services other than securities because that party knew or should have known that the other party would use the transaction to mislead investors in its stock would introduce potentially far-reaching duties and uncertainties for those engaged in day-to-day business dealings. Decisions of this magnitude should be made by Congress."

Charter Communications, at 992-93.

Based upon the holdings in both Central Bank, *supra.* and Charter Communications, *supra.*, this Court finds that the Lead Plaintiff has failed to make any allegations of primary liability with respect to defendant BMS, that the Second Amended Complaint alleges only aiding and abetting and thus, the claim(s) as contained in Count I of the Second Amended Complaint must be dismissed.

In light of the Court's findings, the Court has no need to further address defendant BMS' claim that the Lead Plaintiff has failed to state a claim under Rule 9(b) Fed.R.Civ.P. and/or the "heightened pleading standard" of the PSLRA.

Dated this __23rd__ day of June, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE