UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GARY DUTTON, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | Case No. 4:04CV147SNL |
| D&K HEALTHCARE RESOURCES, ET. AL., ) ) ) ) | |
| Defendants. ) | |

## MEMORANDUM

Lead Plaintiff has filed this second amended complaint on behalf of purchasers of D&K Healthcare Resources, Inc.'s (hereinafter referred to simply as D&K) common stock between August 10, 2000 and September 16, 2002, inclusive. He asserts violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (Count I - all defendants[1]) and Section 20(a) of the Securities Exchange Act of 1934 (Count II - Individual Defendants only). This matter is before the Court on Individual Defendant Plotnick's motion to dismiss (#92/#93), filed February 4, 2005. Extensive responsive pleadings have been filed and this matter is now ripe for disposition.

Defendant Plotnick seeks to dismiss this second amended complaint for expiration of the applicable statute of limitations; for failure to state a claim under Rule 12(b)(6) Fed.R.Civ.P. in connection with the fraud pleading requirements of Rule 9(b) Fed.R.Civ.P. and/or the

---

[1]The defendants in this case are as follows: D&K Healthcare Resources, Inc.; Bristol-Myers Squibb (hereinafter referred to as BMS); and J. Hord Armstrong, III, Martin D. Wilson, Thomas S. Hilton, and Richard Plotnick (hereinafter referred to as the Individual Defendants).

"heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §78u-4; and for failure to state a claim for "control person liability" under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a).

The claims of the second amended complaint essentially boil down to an allegation that the defendants all conspired to engage in a "scheme to defraud" or course of conduct designed to operate as a fraud or deceit upon D&K investors between August 10, 2000 and September 16, 2002. Lead Plaintiff contends that D&K reported favorable earnings and expected earnings during this time-period while knowing that their accounting methods were suspect and such positive predictions could not be realistically achieved. Lead Plaintiff further asserts that the "lynchpin" of this scheme to defraud was an agreement among the defendants to help BMS improperly inflate its revenue and earnings by enabling BMS to engage in "channel-stuffing"; i.e. D&K pretending to "buy" large quantities of pharmaceutical products from BMS when in fact such purchases were being warehoused on a consignment basis. Lead Plaintiff alleges that D&K then listed these "consignments" improperly as "assets" giving the impression that its assets were much larger than they actually were at the time. Lead Plaintiff contends that BMS entered into this arrangement knowing that D&K intended to account for the "channel stuffing" improperly and that market analysts would rely upon these artificially inflated revenues and cash flow in making stock recommendations. Lead Plaintiff does not assert that BMS actually participated in the preparation or dissemination of the allegedly fraudulent financial statements and press releases/media reports upon which market analysts and/or investors relied.

In his motion to dismiss, Plotnick contends firstly that the Lead Plaintiff has failed to bring this action within the applicable two (2) year statute of limitations. Secondly, Lead Plaintiff has failed to state any claim against him for violations of Section 10(b) and Rule 10b-5; and that as a

middle-level manager with limited supervisory duties he fails to meet the standard for "control person liability" under Section 20(a).

In passing on a motion to dismiss, a court must view the facts alleged in the complaint in the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232 (1974); Conley v. Gibson, 355 U.S. 41, 45-46(1957); Toombs v. Bell, 798 F.2d 297, 298 (8th Cir. 1986). The court must accept the allegations in the complaint as true and draw reasonable inferences in favor of the nonmoving party, dismissing the complaint only if "it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, *supra*, 355 U.S. at 45-46; *see also*, Moses.com Securities v. Comprehensive Software Systems, Inc., 406 F.3d. 1052, 1062 (8th Cir. 2005). "Although the pleading standard is liberal, the plaintiff must allege facts -- not mere legal conclusions -- that, if true, would support the existence of the claimed torts. Moses.com, at 1062 *citing* Schaller Tel.Co. v. Golden Sky Sys., 298 F.3d. 736, 740 (8th Cir. 2002). In viewing the complaint in the light most favorable to the plaintiff, the court should not dismiss it merely because the court doubts that the plaintiff will be able to prove all of the necessary allegations. Bennett v. Berg, 685 F.2d. 1053, 1058 (8th Cir. 1982). Thus, a motion to dismiss is likely to be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief." Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982).

**Sarbanes-Oxley Act of 2002 - Statute of Limitations in Securities Fraud Cases**

In 2002, Congress passed the Sarbanes-Oxley Act of 2002, 28 U.S.C. §1658(b), which established as new statute of limitations for federal securities law claims. The new law applies a statute of limitations for private securities fraud cases to shorter of two (2) years from date of

3

discovery or five (5) years from date of occurrence. The Sarbanes-Oxley Act provides, in pertinent part:

> "(b) . . . a private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws, as defined in section 3(a)(47) of the Securities Exchange Act of 1934 (15 U.S.C. 78c(a)(47)), may be brought not later than the earlier of –
>
> (1) 2 years after the discovery of the facts constituting the violation; or
> (2) 5 years after such violation."

28 U.S.C §1658(b)(1) and (2); In Re: ADC Telecommunications, Inc. Securities Litigation, 409 F.3d. 974, 976-77 (8th Cir. 2005).

Defendant Plotnick alleges that the Lead Plaintiff was well aware of the facts he claims constituted the securities law violations no later than September 2002 but failed to file an amended complaint first naming Plotnick as a defendant until November 2004, more than 26 months after discovering the conduct he now alleges was fraudulent.

A plaintiff in a federal securities lawsuit is deemed to have discovered fraud for purposes of triggering the applicable statute of limitations not only when said plaintiff actually discovers the alleged fraud but also when said plaintiff was on "inquiry notice" of such alleged fraud. Great Rivers Co-op of Southeastern Iowa v. Farmland Indus., Inc., 120 F.2d. 893, 896 (8th Cir.

1997)[2]; *see also*, Ritchey v. Horner, 244 F.3d. 635, 638-341 (8th Cir. 2001); Cohen, et. al. v. Northwestern Growth Corp. et. al., 385 F.Supp.2d. 935 (D.S.D. 2005). The determination of whether "inquiry notice' of federal securities fraud exists is an objective standard based upon facts known to the plaintiff; i.e. when the plaintiff is aware of facts that would lead a reasonable person to investigate and consequently acquire actual knowledge of the alleged fraudulent conduct. Ritchey, at 638; Great Rivers Cooperative of Southeastern Iowa, at 896; Cohen, at 945. Inquiry notice exists when there are "storm warnings" that would alert a reasonable person of the possibility of misleading information, disseminated either by an act or by omission. Great Rivers Cooperative of Southeastern Iowa, at 896 *citing* Davidson v. Wilson, 973 F.2d. 1391, 1402 (8th Cir. 1992); *see also*, Cohen, at 945 *citing* Great Rivers, *supra*. and Davidson, *supra*. Although the issue of whether a plaintiff was on inquiry notice is often inappropriate for resolution on a motion to dismiss under Rule 12(b)(6), where the complaint contains facts needed to make a determination regarding whether a reasonable investor of ordinary intelligence would have been aware of the existence of the alleged fraud, a court may properly rule on the issue of inquiry notice on a motion to dismiss. Cohen, at 945 (internal citations omitted). Finally, contrary to the defendants' assertion that the burden lies with the Lead Plaintiff, since the statute of limitations argument is an affirmative defense, the defendants bear the burden of proof. Ritchey, at 639; *see also*, Comcast of Illinois X, L.L.C. v. Multi-Vision Electronics, Inc., - F.Supp.2d. -, 2005 WL 2177070 (D.Neb. September 8, 2005).

---

[2]The relevant caselaw on the issue of timeliness in securities fraud cases for the most part predate the enactment of the Sarbanes-Oxley Act on July 30, 2002. However, it appears to this Court that the Eighth Circuit has yet to change its mind set as to the principles embraced in these pre-2002 cases regarding inquiry notice; thus, until the Eighth Circuit or the United States Supreme Court determine that the doctrine of inquiry notice does not apply to the expanded statute of limitations under the Sarbanes-Oxley Act, the Court finds that the principles set forth in such cases are still applicable and provide guidance to this Court.

In determining whether inquiry notice exists, the Court must ascertain 1) the facts of which the plaintiff was aware; 2) whether a reasonable person with knowledge of those same facts would have investigated the situation further; and 3) whether upon investigation, a reasonable person would have acquired actual notice of the defendant(s)' misrepresentations. Ritchey, at 639 *citing* Great Rivers Cooperative of Southeastern Iowa, at 896; Cohen, at 945 *citing* Great Rivers, *supra.*

Upon consideration, the Court finds that dismissal of the Lead Plaintiff's Section 10(b) and Rule 10b-5 claims is appropriate, as the statute of limitations expired no later than September 24, 2004. Based upon the allegations pled in the second amended complaint, Lead Plaintiff had inquiry notice, if not actual notice, of the alleged fraud as of September 2002.

Lead Plaintiff was aware of a "significant drop of over 65%" in D&K's stock price from October 1999 to May 2000. Second Amended Complaint, ¶34. He attributed this drop to D&K's loss of two (2) of its biggest customers and the sales related to these customers as noted in the company's 10-K for FY01. Lead Plaintiff avers that D&K implemented a strategy to compensate for the loss of this business by engaging in "speculative purchases" which it presented to the market and investors in its public statements as "opportunities to purchase branded pharmaceuticals from manufacturers at attractive prices." Second Amended Complaint, ¶35. Lead Plaintiff also avers that in 2000, defendant Plotnick's company Jaron, Inc. was acquired by D&K at which time Plotnick became the division head for the company's Weston, Florida division. As division head, Plotnick became the Vice-President and General Manager of Procurement. Second Amended Complaint, ¶36. Lead Plaintiff further avers that as of 2001 the Weston facility averaged $150 million per month in sales; yet, on average each of D&K's other distribution facilities only had sales of approximately $250 per year. Second Amended Complaint,

6

¶39. Lead Plaintiff further avers that between November 2000 and October 2003, BMS was the largest supplier of pharmaceuticals to the Weston facility, accounting for approximately 50% of the total inventory. Second Amended Complaint, ¶42. Lead Plaintiff further avers that in Spring 2002, BMS ceased making shipments of its pharmaceutical products to the Westin facility; however, throughout 2001 and 2002 D&K via numerous press releases and its prospectus announced a secondary offering of its stock and expansion of its credit facilities. Second Amended Complaint, ¶¶42, 69-73. Lead Plaintiff further avers that on April 25, 2002 BMS issued a press release announcing a decline in its revenue for the first quarter of 2002 which it partly attributed to the "overstocking of the company's wholesalers with inventory.". Second Amended Complaint, ¶74. Lead Plaintiff further avers that on July 11, 2002 BMS disclosed publicly the SEC investigation into its inventory and accounting practices. Second Amended Complaint, ¶75. Lead Plaintiff further avers that following a conference call with analysts on August 14, 2002, D&K, on September 16, 2002 "shocked the market when it announced that it was reducing its `EPS guidance before one-time charges related to the implementation of SFAS 142 to approximately $0.13-$0.17, from $0.30 to $0.31.'" Second Amended Complaint, ¶77. Lead Plaintiff further avers that in a press release the same day, defendant Armstrong outlined the sales shortfalls resulting in a reversal of the growth in revenue and later discussed same with analysts. Second Amended Complaint, ¶77. Lead Plaintiff further avers that "[i]n response to these disclosures, on September 17, 2002, the price of D&K common stock dropped more than 60% to close at $9.51 per share on extremely high trading volume." Second Amended Complaint, ¶79. Lead Plaintiff further avers that in an article published in the St. Louis Post-Dispatch on September 18, 2002 entitled **Investors Pummel D&K for Surprise Forecast**, A.G. Edwards analyst Andrew Speller stated "[Y]ou had the end of a growth story", and he changed

7

his "buy" rating on D&K to a "sell" as did analysts at four (4) other brokerage firms. Second Amended Complaint, ¶80.  Lead Plaintiff further avers that also in this same article defendant Wilson had stated that "some manufacturers may be cutting back on deals in reaction to the Securities and Exchange Commission's inquiry into Bristol-Myers Squibb Co.'s accounting of its deal-based forward-selling practices" and that BMS had disclosed in April 2002 that "the sales incentives it used in previous years encouraged wholesalers to stockpile products."  Second Amended Complaint, ¶80.  The Lead Plaintiff further avers that, on September 24, 2002, in its Form 10-K for fiscal year 2002, "D&K finally disclosed that it had been receiving `special purchasing opportunities'" which it was no longer receiving.  Second Amended Complaint, ¶81.

   The Court finds that a reasonable investor of ordinary intelligence and through the exercise of reasonable diligence would have been able to ascertain the alleged fraud as of September 2002.  Indeed, Lead Plaintiff, in its own pleading, affirmatively alleges that as of September 24, 2002 by virtue of D&K's 10-K filing, "these disclosures admitted to the market that the financial benefits achieved as a result of the fraudulent scheme had come to an end."  Second Amended Complaint, ¶15.  Given that Lead Plaintiff characterizes defendant Plotnick as instrumental, if not the key player, in the alleged fraudulent scheme, Lead Plaintiff's failure to not name him as a defendant until November 2004 (well after the filing of the original complaint) does not demonstrate the reasonable exercise of due diligence.  Defendant Plotnick's alleged conduct was evidently not a well-kept secret given the pervasive witness accounts by the numerous unidentified persons in the Second Amended Complaint.  Furthermore, there is nothing to indicate that his whereabouts were unknown to the Lead Plaintiff until November 2004.  Whether it be actual notice or inquiry notice, Lead Plaintiff failed to exercise reasonable diligence and the Section 10(b) and Rule 10b-5 claims against him are time-barred.

## Federal Securities Law - Section 10(b) and Rule 10b-5

*Assuming arguendo* that the federal securities claims against defendant Plotnick are not time-barred, such claims still fail because they fail to meet the pleading standards of Rule 9(b) Fed.R.Civ.P. and the heightened pleading standards of the PLSRA.

In Count I of his second amended complaint, Lead Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5. Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in the sale and purchase of securities. Section 10(b) forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations". Dura Pharmaceuticals v. Broudo, - U.S. -, 125 S.Ct. 1627, 1630-31 (2005) *citing* 15 U.S.C. §78j(b); *see,* Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P., 395 F.3d. 851, 853-54 (8th Cir. 2005); In re: K-Tel International, Inc. Securities Litigation, 300 F.3d. 881, 888 (8th Cir. 2002); In re: Navarre Corp. Securities Litigation, 299 F.3d. 735, 741 (8th Cir. 2002). Rule 10b-5 forbids, any person, directly or indirectly, from employing any device, scheme or artifice to defraud; in the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security. In Re: Charter Communications Securities Litigation, 443 F.3d. 987, 990 (8th Cir. 2006) *citing* 17 C.F.R. §240.10b-5; Dura Pharmaceuticals, 125 S.Ct. at 1631 *citing* 17 C.F.R. §240.10b-5 (2004).

In Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), the Supreme Court found that §10(b) prohibits only "manipulative or deceptive" devices or contrivances, and that private plaintiffs "may not bring a [Rule] 10b-5 suit against a defendant for

9

acts not prohibited by the text of §10(b)." Central Bank, 511 U.S. at 173; Charter Communications, at 990. "In earlier cases, the Court held that `deceptive' conduct involves either the misstatement or a failure to disclose by one who has a duty to disclose. `Manipulative,' as used in the securities context, is a `term of art' and refers to illegal trading practices such as `wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" Charter Communications, at 990 (internal citations omitted). Based upon these earlier cases and the text and legislative history of the 1934 Act, the Court in Central Bank, *supra.*, held that Rule 10b-5 does not reach those persons who only aid or abet a violation of §10b. Central Bank, 511 U.S. at 177; Charter Communications, at 990. However, the law's reach is not completely cut off as to these persons:

> "The absence of §10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met."

Central Bank, 511 U.S. at 191; Charter Communications, at 991 *quoting* Central Bank, *supra.*

Upon review of Central Bank, *supra.*, the Eighth Circuit Court of Appeals concluded that it stood for three (3) governing principles: 1) the "categorical declaration" that a private plaintiff may not bring a Rule 10b-5 lawsuit against a defendant for acts not prohibited by the text of §10b included claims under Rule 10b-5(a) and (c), as well as Rule 10b-5(b); 2) a device or contrivance is not "deceptive" within the meaning of §10b, absent some misstatement or failure to disclose by one who has a duty to disclose; and 3) the term "manipulative" in §10b has a limited contextual meaning as defined in Santa Fe Industries, Inc. v. Green, 430 U.S. 462, 476-77 (1977) and adopted by the Court in Central Bank, *supra.* Charter Communications, at 992. "Thus, any

10

defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under §10(b) or any subpart of Rule 10b-5." Charter Communications, at 992 (internal citations omitted).

Private securities fraud actions brought under Section 10(b) and Rule 10b-5 require the pleading and showing of these elements: 1) a material misrepresentation or omission; 2) scienter (a wrongful state of mind); 3) a connection with the purchase or sale of a security; 4) reliance or "transaction causation"; 5) economic loss; and 6) "loss causation" or a causal connection between the material misrepresentation and the loss. Dura Pharmaceuticals, 125 S.Ct. at 1631; *see* Ferris, Baker Watts, at 854; K-tel, at 888; Navarre, at 741. Since Section 10(b) and Rule 10b-5 actions are grounded in fraud, the more stringent pleading standards of Rule 9(b) Fed.R.Civ.P. are applicable. In re: Nationsmart Corp. Securities Litigation, 130 F.3d. 309, 320 (8th Cir. 1997); In re: BankAmerica Corp. Securities Litigation, 78 F.Supp.2d. 976, 987 (E.D.Mo. 1999); Jakobe v. Rawlings Sporting Goods Co., 943 F.Supp. 1143, 1152 (E.D.Mo. 1996).

Pursuant to Rule 9(b) Fed.R.Civ.P., all allegations of fraud must be stated with particularity. To meet the requirements of Rule 9(b), a pleading must include "such matters as the time, place, and contents of false representations, as well as the identity of the person making the misrepresentation and what was obtained or given up thereby." Bennett v. Berg, 685 F.2d. 1053, 1062 (8th Cir. 1982); *see also*, Wiley v. Mitchell, et. al. 106 Fed.Appx. 517, 521-22 (8th Cir. 2004)(unpublished). Compliance with the particularity requirements of Rule 9 requires plaintiffs to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." In re BankAmerica Corp. Securities Litigation, 78 F.Supp.2d. 976, 987 (E.D.Mo. 1999)(citation omitted).

"[C]onclusionary allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Commercial Prop.Inv., Inc. v. Quality Inn Int'l, Inc., 61 F.3d 639, 644 (8th Cir. 1995).

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §78u-4, embodies the pleading requirements of Rule 9 Fed.R.Civ.P. Ferris, Baker Watts, at 854; K-tel, at 889; *see* Navarre, at 742 (given that the PSLRA embodies the pleading requirements of Rule 9, plaintiffs do not need to meet the requirements of both, and the PLSRA supercedes; i.e. under Rule 9 state of mind can be averred generally; however, under the PLSRA, both falsity and scienter must be pleaded with particularity). Complaints brought under Section 10(b) and Rule10b-5 are governed by special heightened pleading standards adopted by Congress in the PSLRA. These heightened pleading standards are unique to securities actions and were adopted by Congress in an attempt to curb abuses of securities fraud litigation. Kushner v. Beverly Enterprises, 317 F.3d. 820, 826 (8th Cir. 2003) *citing* Navarre, at 741; *see* Amdocs, at 547 *citing* Navarre, at 741.

The PSLRA requires plaintiffs "to specify each misleading statement or omission and specify why the statement or omission was misleading." Kushner, at 826; Navarre, at 741-42; *see*, In Re: Cerner Corp. Securities Litigation, 425 F.3d. 1079, 1083 (8th Cir. 2005)(a plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each statement is misleading); 15 U.S.C. §78u-4(b)(1). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Kushner, at 826; Navarre, at 741-42; 15 U.S.C. §78u-4(b)(2); *see* Ferris, Baker Watts, at 854; K-tel, at 889. The Act requires that the allegations collectively establish a strong inference of the required state of mind. Cerner Corp., at 1083; Kushner, at 826. Any complaint failing to meet these pleading requirements must be dismissed. Kushner, at 826; In re: BankAmerica Corp.

Securities Litigation, at 988; 15 U.S.C. §78u-4(b)(3)(A). Finally, the Reform Act requires the courts to disregard "catch-all" or "blanket" assertions that do not live up to the particularity requirements. Ferris, Baker Watts, at 853; Amdocs, at 547; K-tel, at 889; Kushner, at 824; Florida State Bd. of Admin. v. Green Tree, 270 F.3d. 645, 660 (8th Cir. 2001). "In order to satisfy the Reform Act's falsity pleading standard, a complaint may not rest on mere allegations that fraud has occurred." Cerner Corp., at 1083 *citing* Navarre, at 742.

The Eighth Circuit has established a three-prong formula for assessing the adequacy of scienter allegations. After reviewing the tests promulgated by the other circuits to meet the Reform Act's "strong inference of scienter" standard, the appellate court fashioned its own criteria for indicia of fraud:

> "Therefore, we can say three things about motive and opportunity allegations. First, motive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard. Second, in some cases the same circumstantial allegations that establish motive and opportunity also give additional reason to believe the defendant's misrepresentation was knowing or reckless. For instance, in insider trading cases, the timing of trades shows motive and opportunity, but it may also provide additional circumstantial evidence that the defendant knew of an advantage. Such allegations may meet the Reform Act standard, but if so it is because they give rise to a strong inference of scienter, not merely because they establish motive and opportunity. Third, when the complaint does not show motive and opportunity of any sort - either the unusual, heightened motive highlighted in the Second Circuit cases, or even an everyday motive such as keeping one's job - then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard."

Florida State Bd. of Admin. v. Green Tree, at 660. Thus, inferences of scienter will survive a motion to dismiss only it they are "both reasonable and strong." Cerner Corp., at 1084 *citing* Kushner, at 827. "Scienter is normally a factual question to be decided by a jury, but the

complaint must at least provide a factual basis for its scienter allegations." Cerner Corp., at 1084-85 *citing* K-tel, at 894.

Mere negligence does not violate federal securities law; however, severe recklessness may. Ferris, Baker Watts, at 854 (citations omitted).

> "Specifically, scienter may be demonstrated by severe recklessness involving `highly unreasonable omissions or misrepresentations' amounting to `an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.' Recklessness, then, may be shown where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it."

Kushner, at 828 *citing* K & S P'ship v. Cont'l Bank, N.A., 952 f.2d. 971, 978 (8th Cir. 1991); *see also*, Ferris, Watts Baker, at 854. "This level of recklessness requires that defendants make statements that they know, or have access to information suggesting, are materially inaccurate." Ferris, Baker Watts, at 854 *citing* Navarre, at 746.

The general allegations and speculations contained throughout the Second Amended Complaint, and in particular, Count I are inadequate under the pleading requirements of Rule 9 Fed.R.Civ.P. and the heightened pleading requirements of the PSLRA. While the Second Amended Complaint attributes specific statements to others, especially the other Individual Defendants, there is not a single (mis)statement attributed to defendant Plotnick. There is not a single allegation that defendant Plotnick signed or caused to by signed any document submitted to the SEC or any document disseminated to the investing public. The allegations against defendant Plotnick consist solely of his ability to buy product from BMS which the Lead Plaintiff contends was the centerpiece of the ultimate scheme to artificially inflate the stock price and mislead investors. These allegations consist of:

1) D&K's rapid increase of sales and earnings pre-2002 were due to the fact that ". . . D&K was only able to `get product' because defendant Plotnick - with knowledge and approval of the other Individual Defendants - agreed to purchase product from Bristol-Myers and others on terms that were intended to (and did) mislead investors."
Second Amended Complaint, ¶4.

2) Due to the "illicit nature" of the deals with BMS, Individual Defendants Armstrong and Hilton "made sure the financial results for Plotnick's division were not reported through the Company like every other division, and Plotnick was never required to provide back-up support for his division's financial results through the normal accounting channels - unlike every other division in the Company. Likewise, Plotnick was careful not to share the terms of his arrangements with Bristol-Myers with others within his own division. Thus, even though Plotnick's division was the singular reason for the Company's rapid growth during the Class Period, other than the Individual Defendants, nobody `knew what [Plotnick] did or how he did it . . . No one questioned him because he made so much money for the Company.'"
Second Amended Complaint, ¶19.

3) The Lead Plaintiff characterizes Plotnick as Individual Defendants Wilson's and Armstrong's "glory boy" because Plotnick's division was "single-handedly responsible for the rapid growth in sales and earnings for the entire Company during the Class Period."
Second Amended Complaint, ¶36.

4) Lead Plaintiff alleges that based upon an unidentified witness, Plotnick was the head of all pharmaceutical purchasing, and furthermore, "became extremely successful in the so-called `speculative purchases' of drugs."
Second Amended Complaint, ¶¶37-38.

5) Lead Plaintiff alleges that no one but Plotnick knew the name of the salesperson or contact person at BMS or was privy to the details of the deals Plotnick made with BMS. This "secrecy" was fostered by "surround[ing] himself in the small, 12-person Weston facility office with trusted employees such as his best friend, and a brother-in-law."
Second Amended Complaint, ¶41.

Essentially, the Lead Plaintiff's allegations against defendant Plotnick are that he made

profitable deals with BMS which not only benefitted his division, but the entire company. Furthermore, that he did not discuss his deals with fellow employees except for a few trusted ones in his division. Finally, that Plotnick reported directly to upper management; that the monthly financial reports were not prepared by Plotnick but rather by the division's controller under the supervision of Chuck Levy (Vice President of Financial Services for D&K); and Plotnick's expense accounts were reviewed by D&K's controller, who reported to D&K's senior management. Second Amended Complaint, ¶¶52-56.

None of these allegations point to any involvement by Plotnick with D&K's financial statements, accounting statements, or any information disseminated to the investing public. None of these allegations even remotely link Plotnick to the content or timing of D&K's public disclosures. None of these allegations provide any specific evidence of Plotnick's participation in the general operations of D&K. At best, these allegations depict a shrew businessman who put together profitable deals for his division with BMS. At worse, these allegations may marginally depict a middle manager aiding and abetting senior management with the alleged channel-stuffing scheme to artificially create growth in revenue and indirectly cause the alleged misrepresentations about said revenue. However, liability does not attach under §10(b) and/or Rule 10b-5 for aiding and abetting. Central Bank, *supra.*; Charter Communications, *supra.*

The Lead Plaintiff has failed to allege any facts relating to any identified statement attributable to defendant Plotnick which shows that Plotnick was aware or should have been aware of such statement(s) misleading the investing public. The Lead Plaintiff has only provided speculation and generalizations to cast a bad light on Plotnick doing anything but buying and selling pharmaceutical products from BMS in such a manner as to make money for the company.

Having failed to meet the pleading requirements for a claim against defendant Plotnick for violation of §10(b) and Rule 10b-5, said claims as contained in Count I against defendant Plotnick will be dismissed.

### Section 20(a) - Controlling Person Liability

Lead Plaintiff also asserts a claim against defendant Plotnick under 20(a) of the Exchange Act. Section 20(a) of the Exchange Act imposes liability on "every person who, directly or indirectly, controls any person liable" under the Exchange Act; and such liability should be imposed "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." A "control person" relationship exists whenever "(I) the alleged control person actually exercised control over the general operations of the primary violator and ( ii) the alleged control person possessed-- but did not necessarily exercise-- the power to determine the specific acts or omissions upon which the underlying violation is predicated." Farley v. Henson, 11 F.3d. 827, 835 (8th Cir. 1993); *see*, Metge v. Baehler, 762 F.2d. 621, 624 (8th Cir. 1985); Stephenson v. Deutsche Bank AG, 282 F.Supp.2d. 1032, 1059 (D.Minn. 2003); Piper Jaffray Companies v. National Union Fire Ins. Co. of Pittsburgh, 38 F.Supp.2d. 771, 782 (D.Minn. 1999). The control-person statute is "remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a `controlling person' liable." Farley, at 836 *quoting* Myzel v. Fields, 386 F.2d. 718m 738 (8th Cir. 1967); Stephenson, at 1059 (*quoting* both Farley and Myzel, *supra.*); *see also*, Martin v. Shearson Lehman Hutton, 986 F.2d. 242, 244 (8th Cir. 1993)(statute reaches persons who have only some indirect means of discipline or influence less than actual direction). Section 20(a) can impose liability upon "corporate officers and directors, even in those cases in which they did not directly participate in the bad acts." In re

17

Acceptance Insurance Companies Sec. Litig., 352 F.Supp.2d. 940, 957 (D.Neb. 2004), *aff'd* - F.3d. -, 2005 WL 2060912 (8th Cir. August 29, 2005) *citing* Metge v. Beahler, at 631.  Finally, Section 20(a) is not subject to the heightened pleading standards of either the Reform Act or Rule 9(b) Fed.R.Civ.P.  Stephenson, at 1060 *citing* In re Initial Pub. Offering Sec.Litig., 241 F.Supp.2d. 281, 397 n.185 (S.D.N.Y. 2003).

Upon consideration, the Court will dismiss the Lead Plaintiff's claim of controlling person liability, as contained in Count II of the Second Amended Complaint, against defendant Plotnick.

As stated before, the Second Amended Complaint simply alleges that defendant Plotnick ran the Westin, Florida distribution center for D&K and was in charge of all purchases of pharmaceuticals for D&K.  The Second Amended Complaint also alleges that defendant Plotnick made profitable deals with defendant BMS which he chose not to openly discuss except with a few trusted employees.  Furthermore, the Second Amended Complaint alleges that although there were some differences in how the Westin division's financial reports were handled, said reports were still prepared by that division's controller, not defendant Plotnick, and were provided to D&K's controller.  Finally, the Second Amended Complaint alleges that although D&K's controller believed Plotnick may have been "padding" the corporate expense report with personal expenses, the fact remains that his expense report was reviewed by D&K's controller who reported to D&K's senior management.

What the Second Amended Complaint fails to allege is any involvement by defendant Plotnick with D&K's financial statements, accounting protocols, the content or timing of public disclosures (i.e. media releases and/or prospectuses), or the general operations of D&K.  The Lead Plaintiff fails to provide any factual basis as to how Plotnick's purchasing responsibilities placed him in a position of control within the company capable of directing and/or influencing

18

corporate affairs. The Lead Plaintiff fails to allege any facts which remotely rise to an inference that Plotnick was a policymaker within the corporate structure of D&K. Plotnick was based in Florida, while senior management was based in Missouri. His division's business transactions and finances were supervised by senior management. The allegations contained in the Second Amended Complaint are insufficient to establish controlling person liability upon defendant Plotnick pursuant to Section 20(a) of the Exchange Act.[3] Thus, Count II, as directed against defendant Plotnick, will be dismissed.

Dated this   23rd   day of June, 2006.

*[signature: Stephen N. Limbaugh]*
SENIOR UNITED STATES DISTRICT JUDGE

---

[3]Defendant Plotnick also asserts that controlling person liability cannot be established because there is no underlying §10(b) and Rule 10b-5 liability. If a plaintiff fails to establish an actionable claim for violation(s) of §10(b) and/or Rule 10b-5, then a §20(a) claim is also not actionable. Navarre, at 748; Parnes v. Gateway 2000, 122 F.3d. 539, 550 n.12 (8th Cir. 1997); *see also*, In re BankAmerica Corp. Securities Litigation, 78 F.Supp.2d. 976, 992 (E.D.Mo. 1999). However, at this point, the Court has not made a determination as to the federal securities claims against the remaining Individual Defendants and D&K.