UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| GARY DUTTON, Individually and on Behalf of All Others Similarly Situated, ) ) ) | |
| Plaintiff, ) ) | |
| vs. ) ) | Case No. 4:04CV147SNL |
| D&K HEALTHCARE RESOURCES, ET. AL., ) ) ) | |
| Defendants. ) | |

## MEMORANDUM

Lead Plaintiff has filed this second amended complaint on behalf of purchasers of D&K Healthcare Resources, Inc.'s (hereinafter referred to simply as D&K) common stock between August 10, 2000 and September 16, 2002, inclusive. He asserts violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder (Count I - all defendants[1]) and Section 20(a) of the Securities Exchange Act of 1934 (Count II - Individual Defendants only). This matter is before the Court on D&K and Individual Defendants'[2] motion to dismiss (#90/#91), filed February 4, 2005. Extensive responsive pleadings have been filed and this matter is now ripe for disposition.

---

[1]The defendants in this case are as follows: D&K Healthcare Resources, Inc.; Bristol-Myers Squibb (hereinafter referred to as BMS); and J. Hord Armstrong, III, Martin D. Wilson, Thomas S. Hilton, and Richard Plotnick (hereinafter referred to as the Individual Defendants).

[2]Although the instant motion includes argument on behalf of defendant Plotnick, he filed a separate motion to dismiss which was recently granted by the Court; thus, argument(s) pertaining to him will not be address in this memorandum.

Defendants seek to dismiss this second amended complaint for failure to state a claim under Rule 12(b)(6) Fed.R.Civ.P., in connection with the "heightened pleading requirements" of the Private Securities Litigation Reform Act of 1995 (PSLRA), 15 U.S.C. §78u-4, and for failure to state a claim for "control person liability" under Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §78t(a). They aver, among a myriad of other things, that the Lead Plaintiff has failed to 1) state with any particularity facts demonstrating that D&K made improper purchases of pharmaceutical products; i.e. engaged in channel-stuffing, with defendant BMS; 2) state with any particularity facts demonstrating that the subject sales were in fact "consignments"; 3) state with any particularity all necessary facts forming the basis as to the allegations that subject sales were consignments and that D&K's financial statements violated GAAP[3] due to failure to note subject sales as consignments; and 4) state with any particularity that any defendant acted with the required state of mind (scienter) during the Class Period in perpetuating the alleged fraud upon D&K investors.

The second amended complaint generally alleges that the defendants all conspired to engage in a "scheme to defraud" or course of conduct designed to operate as a fraud or deceit upon D&K investors between August 10, 2000 and September 16, 2002. Lead Plaintiff asserts that the "lynchpin" of this scheme to defraud was an agreement among the defendants to help BMS improperly inflate its revenue and earnings by enabling BMS to engage in "channel-stuffing"; i.e., D&K pretending to "buy" large quantities of pharmaceutical products from BMS when in fact such purchases were being warehoused on a consignment basis. Lead Plaintiff alleges that D&K then listed these "consignments" improperly as assets giving the impression that its assets were much larger than they actually were at the time. Lead Plaintiff alleges that D&K's

---

[3]Generally Accepted Accounting Principles

SEC filings, press releases, and other statements (by D&K and/or Individual Defendants) during the 2001, 2002, and 2003 fiscal years were false or materially misleading because they reported favorable earnings and expected earnings during this time-period while knowing that their accounting methods were suspect and such positive predictions could not be realistically achieved. Specifically, Lead Plaintiff claims that various statements were false and/or misleading because 1) they created a "false impression" that D&K's significant positive growth was coming from a legitimate business enterprise when instead the positive revenue was the "direct result of defendants' channel-stuffing scheme"; 2) defendants knew "given the terms of the incentive-laden and channel-stuffing deals with suppliers such as Bristol-Myers", there was a significant risk that D&K's "special purchasing opportunities" would end "at any moment"; and 3) the "consignment deals" with BMS allowed D&K to inflate its assets on its balance sheets; thereby, violating GAAP.[4]

In passing on a motion to dismiss, a court must view the facts alleged in the complaint in the light most favorable to the plaintiff. Scheuer v. Rhodes, 416 U.S. 232 (1974); Conley v. Gibson, 355 U.S. 41, 45-46(1957); Toombs v. Bell, 798 F.2d 297, 298 (8th Cir. 1986). The court must accept the allegations in the complaint as true and draw reasonable inferences in favor of the nonmoving party, dismissing the complaint only if "it appears beyond a reasonable doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, *supra*, 355 U.S. at 45-46; *see also*, Moses.com Securities v. Comprehensive Software Systems, Inc., 406 F.3d. 1052, 1062 (8th Cir. 2005). "Although the pleading standard is liberal, the plaintiff must allege facts -- not mere legal conclusions -- that, if true, would support

---

[4]The majority of the Lead Plaintiff's allegations regarding the alleged falsity and misleading nature of various statements attributed to the defendants are contained in ¶¶89-148 of the second amended complaint.

the existence of the claimed torts.  Moses.com, at 1062 *citing* Schaller Tel.Co. v. Golden Sky Sys., 298 F.3d. 736, 740 (8th Cir. 2002).  In viewing the complaint in the light most favorable to the plaintiff, the court should not dismiss it merely because the court doubts that the plaintiff will be able to prove all of the necessary allegations.  Bennett v. Berg, 685 F.2d. 1053, 1058 (8th Cir. 1982).  Thus, a motion to dismiss is likely to be granted "only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief."  Fusco v. Xerox Corp., 676 F.2d 332, 334 (8th Cir. 1982).

### Federal Securities Law - Section 10(b) and Rule 10b-5

In Count I of his second amended complaint, Lead Plaintiff alleges violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5.  Section 10(b) and Rule 10b-5 prohibit fraudulent conduct in the sale and purchase of securities.  Section 10(b) forbids (1) the "use or employ[ment] . . . of any . . . deceptive device," (2) "in connection with the purchase or sale of any security," and (3) "in contravention of" Securities and Exchange Commission "rules and regulations".  Dura Pharmaceuticals v. Broudo, - U.S. -, 125 S.Ct. 1627, 1630-31 (2005) *citing* 15 U.S.C. §78j(b); *see,* Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P., 395 F.3d. 851, 853-54 (8th Cir. 2005); In re: K-Tel International, Inc. Securities Litigation, 300 F.3d. 881, 888 (8th Cir. 2002); In re: Navarre Corp. Securities Litigation, 299 F.3d. 735, 741 (8th Cir. 2002). Rule 10b-5 forbids, any person, directly or indirectly, from employing any device, scheme or artifice to defraud; in the making of any "untrue statement of material fact" or the omission of any material fact "necessary in order to make the statements made . . . not misleading; or to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the purchase or sale of any security. In Re: Charter

4

Communications Securities Litigation, 443 F.3d. 987, 990 (8th Cir. 2006) *citing* 17 C.F.R. §240.10b-5; Dura Pharmaceuticals, 125 S.Ct. at 1631 *citing* 17 C.F.R. §240.10b-5 (2004).

In Central Bank of Denver v. First Interstate Bank of Denver, 511 U.S. 164 (1994), the Supreme Court found that §10(b) prohibits only "manipulative or deceptive" devices or contrivances, and that private plaintiffs "may not bring a [Rule] 10b-5 suit against a defendant for acts not prohibited by the text of §10(b)." Central Bank, 511 U.S. at 173; Charter Communications, at 990. "In earlier cases, the Court held that `deceptive' conduct involves either the misstatement or a failure to disclose by one who has a duty to disclose. `Manipulative,' as used in the securities context, is a `term of art' and refers to illegal trading practices such as `wash sales, matched orders, or rigged prices, that are intended to mislead investors by artificially affecting market activity.'" Charter Communications, at 990 (internal citations omitted). Based upon these earlier cases and the text and legislative history of the 1934 Act, the Court in Central Bank, *supra.*, held that Rule 10b-5 does not reach those persons who only aid or abet a violation of §10b. Central Bank, 511 U.S. at 177; Charter Communications, at 990. However, the law's reach is not completely cut off as to these persons:

> "The absence of §10(b) aiding and abetting liability does not mean that secondary actors in the securities markets are always free from liability under the securities Acts. Any person or entity, including a lawyer, accountant, or bank, who employs a manipulative device or makes a material misstatement (or omission) on which a purchaser or seller of securities relies may be liable as a primary violator under 10b-5, assuming *all* of the requirements for primary liability under Rule 10b-5 are met."

Central Bank, 511 U.S. at 191; Charter Communications, at 991 *quoting* Central Bank, *supra.*

Upon review of Central Bank, *supra.*, the Eighth Circuit Court of Appeals concluded that it stood for three (3) governing principles: 1) the "categorical declaration" that a private plaintiff

5

may not bring a Rule 10b-5 lawsuit against a defendant for acts not prohibited by the text of §10b included claims under Rule 10b-5(a) and (c), as well as Rule 10b-5(b); 2) a device or contrivance is not "deceptive" within the meaning of §10b, absent some misstatement or failure to disclose by one who has a duty to disclose; and 3) the term "manipulative" in §10b has a limited contextual meaning as defined in Santa Fe Industries, Inc.v. Green, 430 U.S. 462, 476-77 (1977) and adopted by the Court in Central Bank, *supra.* Charter Communications, at 992. "Thus, any defendant who does not make or affirmatively cause to be made a fraudulent misstatement or omission, or who does not directly engage in manipulative securities trading practices, is at most guilty of aiding and abetting and cannot be held liable under §10(b) or any subpart of Rule 10b-5." Charter Communications, at 992 (internal citations omitted).

Private securities fraud actions brought under Section 10(b) and Rule 10b-5 require the pleading and showing of these elements: 1) a material misrepresentation or omission; 2) scienter (a wrongful state of mind); 3) a connection with the purchase or sale of a security; 4) reliance or "transaction causation"; 5) economic loss; and 6) "loss causation" or a causal connection between the material misrepresentation and the loss. Dura Pharmaceuticals, 125 S.Ct. at 1631; *see* Ferris, Baker Watts, at 854; K-tel, at 888; Navarre, at 741. Since Section 10(b) and Rule 10b-5 actions are grounded in fraud, the more stringent pleading standards of Rule 9(b) Fed.R.Civ.P. are applicable. In re: Nationsmart Corp. Securities Litigation, 130 F.3d. 309, 320 (8th Cir. 1997); In re: BankAmerica Corp. Securities Litigation, 78 F.Supp.2d. 976, 987 (E.D.Mo. 1999); Jakobe v. Rawlings Sporting Goods Co., 943 F.Supp. 1143, 1152 (E.D.Mo. 1996).

Pursuant to Rule 9(b) Fed.R.Civ.P., all allegations of fraud must be stated with particularity. To meet the requirements of Rule 9(b), a pleading must include "such matters as the time, place, and contents of false representations, as well as the identity of the person making the

misrepresentation and what was obtained or given up thereby." Bennett v. Berg, 685 F.2d. 1053, 1062 (8th Cir. 1982); *see also*, Wiley v. Mitchell, et. al. 106 Fed.Appx. 517, 521-22 (8th Cir. 2004)(unpublished). Compliance with the particularity requirements of Rule 9 requires plaintiffs to "specify the statements contended to be fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." In re BankAmerica Corp. Securities Litigation, 78 F.Supp.2d. 976, 987 (E.D.Mo. 1999)(citation omitted). "[C]onclusionary allegations that a defendant's conduct was fraudulent and deceptive are not sufficient to satisfy the rule." Commercial Prop.Inv., Inc. v. Quality Inn Int'l, Inc., 61 F.3d. 639, 644 (8th Cir. 1995).

The Private Securities Litigation Reform Act (PSLRA), 15 U.S.C. §78u-4, embodies the pleading requirements of Rule 9 Fed.R.Civ.P. Ferris, Baker Watts, at 854; K-tel, at 889; *see* Navarre, at 742 (given that the PSLRA embodies the pleading requirements of Rule 9, plaintiffs do not need to meet the requirements of both, and the PLSRA supercedes; i.e. under Rule 9 state of mind can be averred generally; however, under the PLSRA, both falsity and scienter must be pleaded with particularity). Complaints brought under Section 10(b) and Rule10b-5 are governed by special heightened pleading standards adopted by Congress in the PSLRA. These heightened pleading standards are unique to securities actions and were adopted by Congress in an attempt to curb abuses of securities fraud litigation. Kushner v. Beverly Enterprises, 317 F.3d. 820, 826 (8th Cir. 2003) *citing* Navarre, at 741; *see* Amdocs, at 547 *citing* Navarre, at 741.

The PSLRA requires plaintiffs "to specify each misleading statement or omission and specify why the statement or omission was misleading." Kushner, at 826; Navarre, at 741-42; *see*, In Re: Cerner Corp. Securities Litigation, 425 F.3d. 1079, 1083 (8th Cir. 2005)(a plaintiff must plead falsity by specifying each allegedly misleading statement and the reasons why each

statement is misleading); 15 U.S.C. §78u-4(b)(1). Under the PSLRA, the circumstances of the fraud must be stated with particularity, including "such matters as the time, place and contents of false representations, as well as, the identity of the person . . . and what was obtained or given up thereby . . . [t]his means the who, what, when, where, and how." K-tel, at 890 *quoting* Parnes v. Gateway 2000, Inc., 122 F.3d. 539, 549-50 (8th Cir. 1997). The complaint must also "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." Kushner, at 826; Navarre, at 741-42; 15 U.S.C. §78u-4(b)(2); *see* Ferris, Baker Watts, at 854; K-tel, at 889. The Act requires that the allegations collectively establish a strong inference of the required state of mind. Cerner Corp., at 1083; Kushner, at 826. Any complaint failing to meet these pleading requirements must be dismissed. Kushner, at 826; In re: BankAmerica Corp. Securities Litigation, at 988; 15 U.S.C. §78u-4(b)(3)(A). Finally, the Reform Act requires the courts to disregard "catch-all" or "blanket" assertions that do not live up to the particularity requirements. Ferris, Baker Watts, at 853; Amdocs, at 547; K-tel, at 889; Kushner, at 824; Florida State Bd. of Admin. v. Green Tree, 270 F.3d. 645, 660 (8th Cir. 2001). "In order to satisfy the Reform Act's falsity pleading standard, a complaint may not rest on mere allegations that fraud has occurred." Cerner Corp., at 1083 *citing* Navarre, at 742.

The Eighth Circuit has established a three-prong formula for assessing the adequacy of scienter allegations. After reviewing the tests promulgated by the other circuits to meet the Reform Act's "strong inference of scienter" standard, the appellate court fashioned its own criteria for indicia of fraud:

> "Therefore, we can say three things about motive and opportunity allegations. First, motive and opportunity are generally relevant to a fraud case, and a showing of unusual or heightened motive will often form an important part of a complaint that meets the Reform Act standard. Second, in some cases the same circumstantial allegations that establish motive and opportunity also give additional

> reason to believe the defendant's misrepresentation was knowing or reckless. For instance, in insider trading cases, the timing of trades shows motive and opportunity, but it may also provide additional circumstantial evidence that the defendant knew of an advantage. Such allegations may meet the Reform Act standard, but if so it is because they give rise to a strong inference of scienter, not merely because they establish motive and opportunity. Third, when the complaint does not show motive and opportunity of any sort - either the unusual, heightened motive highlighted in the Second Circuit cases, or even an everyday motive such as keeping one's job - then other allegations tending to show scienter would have to be particularly strong in order to meet the Reform Act standard."

Florida State Bd. of Admin. v. Green Tree, at 660. Thus, inferences of scienter will survive a motion to dismiss only it they are "both reasonable and strong." Cerner Corp., at 1084 *citing* Kushner, at 827. "Scienter is normally a factual question to be decided by a jury, but the complaint must at least provide a factual basis for its scienter allegations." Cerner Corp., at 1084-85 *citing* K-tel, at 894.

Mere negligence does not violate federal securities law; however, severe recklessness may. Ferris, Baker Watts, at 854 (citations omitted).

> "Specifically, scienter may be demonstrated by severe recklessness involving `highly unreasonable omissions or misrepresentations' amounting to `an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.' Recklessness, then, may be shown where unreasonable statements are made and the danger of misleading investors is so obvious that the defendant must have been aware of it."

Kushner, at 828 *citing* K & S P'ship v. Cont'l Bank, N.A., 952 f.2d. 971, 978 (8th Cir. 1991); *see also*, Ferris, Watts Baker, at 854. "This level of recklessness requires that defendants make statements that they know, or have access to information suggesting, are materially inaccurate." Ferris, Baker Watts, at 854 *citing* Navarre, at 746.

9

The second amended complaint sets forth numerous public statements made by the defendants during the class period that the Lead Plaintiff believes gives rise to a strong inference of scienter because the defendants knew facts or had access to information that suggested that their public statements were not accurate and/or deliberately engaged in making false and misleading statements in order to defraud the investors as to the true financial condition of defendant D&K. Examples of some of these allegedly inaccurate statements/omissions are as follows:

> 1) The primary omission by the defendants is their failure to disclose the channel-stuffing transactions and consignment sales with BMS; thereby falsely representing D&K's true financial condition and future.
>
> 2) This omission as to the true nature of its business with BMS "colored" the credibility of D&K's statements, press releases, and analyst reporting during the Class Period:
>
>> *Analyst report by Bear Stearns, dated 9/14/2000 stated: "DK WD CEO Hord Armstrong, President Marty Wilson, and CFO Tom Hilton presented at the Bear Stearns Healthcare Conference on Wednesday. We walked away comfortable that the company is able to work past the difficulties it had experienced in the aftermath of the loss of two significant customers, and reiterate our EPS estimates and Attractive rating on shares.
>> - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
>>
>> We believe that the company has taken advantage of losing its two largest customers to concentrate on local and regional retail business, which should produce significantly higher margins. Management pointed to good success signing new customers to replace the lost mail-order business, and we believe that the company is better off concentrating on its core customer base

within its geographical reach of the midwest and contiguous states."

*In D&K's 2001 10-K, D&K "boasted" that its continuing financial success was due to the "experience and expertise of our management team in this area, we also employ sophisticated information and inventory management systems to understand the demand for particular products in advance of buying them for distribution."

*In the Prospectus for the secondary stock offering in June 2001, defendants stated: "The growth of our business in this area has been constrained by our access to working capital required to take advantage of the procurement opportunities made available to us by manufacturers. We believe that the proceeds from the offering and cash generated from our business on an ongoing basis will enable us to take advantage of more of the purchasing opportunities made available to us by manufacturers."

*In an April 24, 2002 press release announcing record financial revenues, defendants stated: "D&K's national pharmacy chain business achieved sales of $385.8 million in the third quarter, an increase of 41.0%, or $112.1 million. The improvement in this trade class over the same period last year is largely due to strong relationships with both suppliers and the chains, which we have been able to optimize with our improved capital structure."

*Again on August 14, 2002, defendants attributed D&K's strong showing to its secondary stock offering and new credit facilities: "Fueled by the capital from our July 2001 follow-on equity offering and expanded credit facilities, D&K again achieved new heights in fiscal 2002, surpassing every performance goal set for each quarter and the full year."

*Also on August 14, 2002, **[following BMS' disclosure of the SEC investigation into its inventory and accounting practice}** defendants held a conference call with analysts in which defendant Wilson stated: "I think because of the situation with Bristol, there has been reactions to the situation with Bristol by the pharmaceutical companies, although after just have been meeting with a lot of the big former **[sic]** companies, I don't see that there will be a significant change

11

overall in the market . . . As I mentioned on the call, we still expect the price increases to be favorable to us, compared to what they were in 2001 and prior to that, which obviously has a big impact on our gross margins. Overall, manufacturers are nervous. They are definitely reviewing their policies and procedures. You know, so far we don't feel that there - the opportunities are just going to dry up total."

*On September 16, 2002 D&K announced it was reducing its "EPS guidance before one-time charges related to the implementation of SFAS 142 to approximately $0.13-$0.17, from $0.30-$0.31." Defendant Armstrong stated: "Having just completed the review of results for the two months ended August 31, it is prudent to reduce our guidance given sales and margin trends that are below plan in both of our principal trade classes. While this is disappointing near-term development, particularly given expectations based on our past sales momentum, we remain very confident that our business model, personnel, industry relationships and track record with customers should enable us to overcome these short-term challenges and eventually return our business to its historical growth trends . . . Given the uncertainty created by revenue and margin shortfalls in both our principal trade classes, it is difficult to predict near term trends. Accordingly, we have revised out Q1 guidance and are now in the process of reassessing customer demand, industry trends and our projections, to provide accurate and timely information to our investors. We look to update our investors on these issues, as well as guidance for the balance of fiscal 2003, in conjunction with our Q1 conference call in late October. Accordingly, D&K cannot at this time reaffirm its guidance for FY 2003, provided on August 14, 2002, which anticipated revenues of `at least $2.8 billion' and EPS before one-time charges related to the implementation of SFAS 142 of `at least $1.75'".

*The September 16, 2002 press release also continue to state that "[T]he sales shortfall is principally the result of fewer than expected purchasing and sales opportunities available during the period. D&K's sales in the national chain business have been variable from month to month historically, driven largely by opportunistic purchases from pharmaceutical companies for distribution primarily to national chains."

*Following the September 17, 2002 price drop of D&K

> common stock, on September 24, 2002 D&K filed its
> Form 10-K for fiscal year 2002 with the SEC in which
> it disclosed that it had been receiving "special purchasing
> opportunities" which no longer existed. It further stated that
> "[W]e continue to make replenishment and forward purchases
> but do not anticipate any special purchasing opportunities
> in the near future, with this supplier."
>
> *On January 22, 2003, D&K issued a press release announcing
> it financial results for the second quarter of fiscal 2003, the
> period ending December 31, 2002. The press release stated:
> "D&K Healthcare achieved a gross profit margin of 4.00
> percent, compared to last year's second quarter gross profit
> margin of 4.14 percent. The decline results primarily from a
> lower gross margin in the national pharmacy chain trade class
> due to fewer attractively priced purchasing opportunities."

Defendants argue that the Lead Plaintiff has failed to set forth the "particularities" as to why the statements are false or misleading. After careful review of the second amended complaint, the Court finds that the Lead Plaintiff has provided particulars as to who made the subject statements, when the statements were made, and demonstrated why the statements were allegedly false or misleading at the time they were made. While the defendants have spent considerable time and effort explaining how and why the statements are proper, none of these arguments undermine the Lead Plaintiff's allegations at the pleading stage. The facts pleaded with particularity sufficiently create a strong inference of scienter, thus meeting the Reform Act standard. *See*, Green Tree Financial, at 667.

Defendants further have contended that statements contained in press releases and other venues were "forward-looking" in substance and intent; thus, protected by the PSLRA's "safe harbor" provision. 15 U.S.C. §78u-5(c)(1)and (2). The "safe harbor" provision protects forward-looking statements if they are identified and accompanied by risk disclosures, if they are immaterial, or if plaintiff(s) fail to prove that the person or persons making the subject statement(s) made them with actual knowledge that the statement was false or misleading. In re:

13

Retek, Inc. Securities, et. al., 2005 WL 1430296 (D.Minn. March 7, 2005); In re: Pemstar, Inc.Sec. Lit., 2003 WL 21975563 (D.Minn. August 15, 2003)[5]. The "safe harbor" provision "does not insulate statements that misrepresent historical/hard or current facts." In re: Pemstar, Inc. Sec. Lit., *supra.* (citations omitted).

Defendants contend that the alleged false or misleading statements are nearly all "forward-looking"in that they simply are statements of future financial projections. They further contend that such statements were rendered "harmless" by the consistent use of "cautionary language" as to the financial projections. The Lead Plaintiff counters that these statements were materially false and/or misleading when made because they omit adverse information concerning the alleged channel-stuffing transactions and/or consignments as the true basis for the inflated revenue predictions. The Lead Plaintiff contends that this information was known and significant when the statements were made; therefore, it was not that the statements in and of themselves were necessarily false but that the defendants were in possession of material facts which they had a duty to disclose so as not to make such statements misleading.

Upon consideration, the Court finds that the cautionary language accompanying the subject statements was too generalized and "boilerplate" to make such language meaningful to the ordinary investor and thus, the subject statements are not protected by the "safe harbor" provision of the PSLRA.

Defendants further contend that the Lead Plaintiff's allegations regarding GAAP violations are not sufficient to plead the requisite scienter for the Section 10(b) and Rule 10b-5. The Lead Plaintiff contends that the defendants were aware of the GAAP violations when made and were

---

[5]Although it is not the Court's usual practice to cite to unpublished court opinions, it will do so as to opinions within the circuit which it believes provides guidance to the Court in determining the issue at hand.

14

intentionally made to meet analysts' profitable expectations for the company. The Lead Plaintiff argues that D&K knowingly failed to properly account for the subject sales transactions as consigned inventory which in turn contributed to the falsity of the financial statements issued throughout the class period.

Essentially, the Lead Plaintiff argues that the accounting principles and standards that existed at the time of the issuance of the subject financial statements were clear and precise as to consigned inventory. He further alleges that the pervasiveness and indifference to the GAAP requirements resulting in such egregarious violations evidences that D&K intentionally misstated its revenues throughout the class period. Defendants spend considerable time, not addressing the pleading standards, but rather defending themselves against the allegations. They simply argue that there were no GAAP violations because the subject sales transactions were not consigned inventory.

"Allegations of GAAP violations are insufficient, standing alone, to raise an inference of scienter. Only where these allegations are coupled with evidence of corresponding fraudulent intent might they be sufficient." Ferris, Baker Watts, Inc. v. Ernst & Young, L.L.P., 395 F.3d. 851, 854 (8th Cir. 2005), *aff'g* 23 F.Supp.2d. 1003 (D.Minn. 2003) *quoting* In re Navarre, at 886, 894-95. This rule was established because the GAAP "are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions. [GAAP], rather, tolerate a range of `reasonable' treatments, leaving the choice among alternatives to management." K-tel, at 890 *quoting* Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544 (1979); In re Stellent, Inc. Sec. Lit., 326 F.Supp.2d. 970, 982 (D.Minn. 2004); Ferris, Baker Watts, 293 F.Supp.2d. at 1008.

Here, the Lead Plaintiff has alleged not only egregious GAAP violations, but also "evidence of corresponding fraudulent intent". He has set out with particularity the material misstatements in the public statements which omitted, among other things, the alleged channel-stuffing transactions and the alleged nature of the "sales" as actually being consigned inventory. Essentially, the second amended complaint alleges that the defendants knew that certain company assets were impaired by the nature of business transactions with BMS and that losses were certain in the near future, but that recognizing this "fact" during the class period would have lowered the company's stock price and threatened its ability to market and sell the stored pharmaceuticals. The second amended complaint further alleges that defendants delayed recognition of the true nature of these channel-stuffing transactions, and delayed accounting for the true nature of these transactions as consigned inventory while publicly touting strong future profits and continued excellent business prospects with current customers. It is alleged that these strategic non-disclosures kept D&K stock artificially high, attracting more investors, until the September 2002 press release was issued causing a drastic stock price fall.

The allegations as a whole, taken as true, provide strong indicia of intentional wrongdoing on the part of the defendants, at least at the pleading stage. Evidence relevant to scienter includes:

> "insider trading in conjunction with false or misleading statements; a divergence between internal reports and public statements; disclosure of inconsistent information shortly after the making of a fraudulent statement or omission; bribery by top company officials; evidence of an ancillary lawsuit, charging fraud, which was quickly settled; disregard of current financial information acquired prior to the statement at issue; accounting shenanigans; and evidence of actions taken solely out of self-interest."

16

In re Acceptance Insurance Cos. Securities Litigation, 352 F.Supp.2d. 94, 958 *quoting* In re Navarre, at 747 (internal citations omitted), *aff'd* 423 F.3d. 899 (8th Cir. 2005). The Lead Plaintiff has coupled his GAAP allegations with the "corresponding fraudulent intent" required under the Reform Act.

Finally, the defendants argue that the allegations regarding the Individual Defendants' alleged insider trading are factually incorrect because Armstrong, Wilson, and Hilton actually ended up with more stock at the end of the class period than at the beginning of the class period. They further argue that the stock sales were nothing more than regular consistent quarterly sales following D&K's public financial filings. Essentially, they argue there was nothing inherently wrong about these stock sales. The Lead Plaintiff argues that these stock sales were significant in amount, expertly timed, and indicate knowledge of an advantage on the part of Armstrong, Wilson, and Hilton. The Lead Plaintiff contends that these stock sales were made not only on the heels of false positive financial statements but also at the time of BMS' April 2002 disclosure of the SEC investigation and its restatement of earnings. Such sales are viewed as unusual and suspicious. In re Navarre, at 747; K-tel, at 896. Furthermore, Lead Plaintiff contends that these stock sales were different from prior sales as to the amount of stock sold.

Upon review, it appears to the Court that the Lead Plaintiff's allegations are sufficient, at the pleading stage, to raise a strong inference of scienter on the part of the Individual Defendants as to their stock sales during the class period. The parties are arguing the merits of the allegations; e.g.. whether the calculation of the sales should include or not include exercised or unexercised options. The merits of the allegations are not for the Court to consider at this time.

The Lead Plaintiff also asserts claims against the Individual Defendants Armstrong, Wilson and Hilton under 20(a) of the Exchange Act. Section 20(a) of the Exchange Act imposes liability

17

on "every person who, directly or indirectly, controls any person liable" under the Exchange Act; and such liability should be imposed "unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action." A "control person" relationship exists whenever "(I) the alleged control person actually exercised control over the general operations of the primary violator and ( ii) the alleged control person possessed-- but did not necessarily exercise-- the power to determine the specific acts or omissions upon which the underlying violation is predicated." Farley v. Henson, 11 F.3d. 827, 835 (8th Cir. 1993); *see*, Metge v. Baehler, 762 F.2d. 621, 624 (8th Cir. 1985); Stephenson v. Deutsche Bank AG, 282 F.Supp.2d. 1032, 1059 (D.Minn. 2003); Piper Jaffray Companies v. National Union Fire Ins. Co. of Pittsburgh, 38 F.Supp.2d. 771, 782 (D.Minn. 1999). The control-person statute is "remedial and is to be construed liberally. It has been interpreted as requiring only some indirect means of discipline or influence short of actual direction to hold a `controlling person' liable." Farley, at 836 *quoting* Myzel v. Fields, 386 F.2d. 718m 738 (8th Cir. 1967); Stephenson, at 1059 (*quoting* both Farley and Myzel, *supra.*); *see also*, Martin v. Shearson Lehman Hutton, 986 F.2d. 242, 244 (8th Cir. 1993)(statute reaches persons who have only some indirect means of discipline or influence less than actual direction). Section 20(a) can impose liability upon "corporate officers and directors, even in those cases in which they did not directly participate in the bad acts." In re Acceptance Insurance Companies Sec. Litig., 352 F.Supp.2d. 940, 957 (D.Neb. 2004), *aff'd* - F.3d. -, 2005 WL 2060912 (8th Cir. August 29, 2005) *citing* Metge v. Beahler, at 631. Finally, Section 20(a) is not subject to the heightened pleading standards of either the Reform Act or Rule 9(b) Fed.R.Civ.P. Stephenson, at 1060 *citing* In re Initial Pub. Offering Sec.Litig., 241 F.Supp.2d. 281, 397 n.185 (S.D.N.Y. 2003). Given the above-referenced legal principles, and in light of the Court's determination that the Lead Plaintiff

18

has sufficiently pled claims against these defendants for violations of Section 10(b) and Rule 10b-5, the Court will not dismiss the claims against the Individual Defendants based on liability under Section 20(a).

The parties have spent considerable time and effort arguing the "merits" of the second amended complaint; however, the bottom line is that the Lead Plaintiff has pleaded that during the class period, the defendants had in their possession facts which rendered their financial results materially false when first stated to the investing public, and given these facts, intentionally delayed recognition of these "facts" in violation of GAAP, then intentionally delayed recognition of the GAAP violations in order to induce the plaintiffs to continue investing in a "profitable" company. Without a doubt the "merits" of the allegations as presented can be argued fervently; and may not hold up once evidence as to the "merits" is presented; however, such a debate involves questions of fact "that cannot render the complaint inadequate, lest the heightened pleading requirements of the Reform Act replace the function of a trial." Green Tree, at 666. The Lead Plaintiff has satisfied the Reform Act standard and the defendants' motion to dismiss will be denied.

Dated this __23rd__ day of June, 2006.

_____
SENIOR UNITED STATES DISTRICT JUDGE